# Understanding and Litigating Parent-Child Alienation Cases

Katharine W. Maddox, Esq.
Maddox & Gerock, P.C.
8111 Gatehouse Road, Suite 410
Falls Church, Virginia 22042
Telephone: 703-883-8035
Email: kmaddox@maddoxandgerock.com
Website: www.maddoxandgerock.com

## I. Introduction

When an allegedly alienated parent (the "rejected parent") tells her attorney that the other parent (the "favored parent") is alienating their child from him,[1] as attorneys we must determine the appropriate course of action to take.

According to two different clinical experts in alienation matters, Edward Farber, Ph.D., and Charles David Missar, Ph.D., when alienation is suspected it is critically important to address the alleged alienation as soon as possible.[2] Dr. Farber explains that with longer delays, the child's position becomes more rigid and rejection becomes entrenched. Dr. Missar explains that as time passes, alienated children become more entrenched in their positions, and the rejected parent becomes even further entrenched in the children's minds with respect to all the reasons the children did not want to have contact with the rejected parent to begin with. Further, the more entrenched the children's position is, the less likely they are to be open to the objective, non-biased reality of the situation. Both experts agreed that after a year of ongoing alienation, it would be extraordinarily hard to regroup and address the alienation with a meaningful chance at successful reunification.

## II. Identification of Alienation

Before alienation can be addressed, it must first be identified. As attorneys, what should we look for? Here again, both experts are in agreement: Extreme behaviors; complaints that are out of proportion to the alleged wrongdoing; terms such as "never" and "always;" inflexibility in the way the child views the rejected parent; words which mimic the words used by the favored parent when describing the rejected parent (including calling the rejected parent by the name the favored parent uses – e.g., "Tom" instead of "dad" or referring to dad as the "birth father"); comments from the child that indicate everything about the rejected parent is negative and everything about the favored parent is positive; complaints which are often trivial and wherein the child's reaction is often overblown and disproportionate to the alleged misdeeds; ambiguous complaints lacking examples; and denials by the alienated child of any history of positive

---

[1] Rejected parents tend to be fathers, though certainly there are alienation cases where the children have rejected their mother. For ease of this article, I have assigned the masculine to the rejected parent and the feminine to the favored parent.
[2] Comments attributed to both Dr. Missar and Dr. Farber are included without use of quotation marks for ease of reading. Some comments are direct quotes, others are paraphrased. Both experts were provided with an opportunity to correct any information attributed to him prior to publication of this article.

1

interaction with the rejected parent despite evidence to the contrary. In short, when children exhibit such extreme views of the rejected parent, this should serve as a warning sign that the child may be, or may be becoming, alienated from that parent.

Other important early warning signs include the "spread" of the extreme behavior. Dr. Farber has found that the alienation spreads from the rejected parent to the rejected parent's extended family. Further, both experts agree that a child's acute awareness of legal proceedings is a hallmark sign that alienation may be occurring.

Dr. Missar explains that the term "alienation" does not refer to a specific mental disorder within the DSM-V, but it is a generally accepted phenomenon researched within the field of forensic psychology. Alienation is more than estrangement from a parent, or simply the absence of contact with a parent. It is a circumstance in which a child has an extremely negative reaction to a parent that takes cognitive, emotional and behavioral forms. Alienation is not simply loving one parent more than another. Alienated children have a strong and often irrational aversion toward a parent with whom they formerly enjoyed a close relationship. The aversion may take the form of fear, hatred and/or avoidance.

Dr. Missar further explains that there are two types of alienation – overt alienation and subtle alienation.

Dr. Missar cites examples of overt alienation as follows:

- Telling the children negative things about the rejected parent;
- Telling the children that the divorce was the rejected parent's fault;
- Telling the children that the rejected parent is a bad person;
- Telling the children that the rejected parent does not love them;
- Convincing the children that the rejected parent took an action which in fact was not an accurate representation (it may be a lie, a negative exaggeration and/or "spin" of past action); and
- Convincing the children that the rejected parent was responsible for something which, under a review of the facts, was not the rejected parent's fault nor responsibility.

In contrast, he lists examples of subtle alienation as follows:

- The favored parent accepting the child's refusal to spend time with the rejected parent;
- Failure by the favored parent to implement consequences for children refusing contact with the rejected parent;
- The favored parent's attendance at events the favored parent knows the rejected parent will also be attending, thereby setting up a direct conflict for the child as to which parent to associate with; and
- Scheduling activities for the child which conflict with the rejected parent's custodial time.

Dr. Missar explains that by subtly coopting time away from the rejected parent or inserting oneself into activities that the rejected parent would also attend, the favored parent can further alienate the child by making the child choose between parents in those moments.

As attorneys, we must recognize that if our client is the allegedly alienating parent, he or she will likely not admit to or even recognize that they are doing anything wrong. Dr. Missar points out that most favored parents will not expressly tell a child to reject his/her parent, nor will the favored parent admit to any alienating behavior. The favored parent will usually insist to the children and to anyone involved that it is the rejected parent's actions which have solely contributed to the child's alienation and rejecting behavior. It is rare that a favored parent will overtly brainwash children to reject the alienated parent. However, subtle but ongoing alienation can often times be more effective than overt alienation in impacting a child's relationship with and rejection of the alienated parent.

Dr. Missar stresses that alienated children, who may act terribly towards the rejected parent, often do not behave inappropriately with other third parties and may appear to be thriving in all other areas of their life including socially and academically.

### III. The Players in Alienation Cases

According to Dr. Farber, alienation cases have three players: (1) An attached parent who sees her job as protecting the child from the other parent, (2) a vulnerable child often with other emotional issues and (3) the rejected and often angry parent.

The attached parent will often focus on the child's perceived fear relating to the rejected parent, and often state that she *wants* the child to have a good relationship with, and contact with, the rejected parent. Dr. Missar has seen many instances where the statements of support for the relationship are not matched by actions, and there may be evidence that the favored parent is actually rewarding the child for alienation or at the very least, not imposing any repercussions for a child when said child refuses a visit with the rejected parent. Dr. Farber has found that the favored parent is often not the parent to initiate the divorce and the favored parent frequently appears to be excessively attached to the child.

Dr. Farber finds that often there is a depressive quality or anxiety, which makes the child vulnerable. The divorce and ongoing parental conflict increases the level of anxiety and the angry parent becomes the subject of anxiety and fear. When the child contemplates visiting with the rejected parent, physiological signs of fear develop. The child's heart races, their palms get sweaty and the child's mind races. The child then avoids the parent and this fear progressively worsens every time the child thinks about the rejected parent. This can lead to a complete refusal of contact.

According to Dr. Farber, the rejected parent usually believes that the child and the favored parent are fabricating allegations about them. Dr. Missar points out that although the rejected parent may be partially at fault for the alienation, this situation is easier to treat through reunification therapy as opposed to working through a child's irrational alienation from the rejected parent.

### IV. <u>Why should we care if there is alienation?</u>

Dr. Farber's review of the research on alienation concludes that approximately 50% of children who rejected contact with a parent during childhood end up having no contact in adulthood with the parent they were formally attached to. Further, when young adults who had no contact with a parent were asked what they wished had happened when the rejection commenced, about half of the respondents stated that they wished someone in authority had forced them to have contact with the rejected parent.

As family law attorneys, with our focus on <u>families</u>, I believe it is our duty to understand these issues, to work with experts where appropriate, and to address these issues. We must understand these family dynamics in order to advise our clients in the direction that preserves family relationships, regardless of marital status.

In addition to the loss of a parent that may result from alienation, Dr. Missar identifies five potential long-term consequences to the child resulting from unresolved alienation and rejection of a parent:

1. Long term problems with trust;
2. Irrational views of people who may have wronged them;
3. Increased problems with mental health disorders;
4. Increased problems with substance abuse; and
5. Problems keeping marriages and jobs intact.

### V. <u>As litigators and advocates, how should we address alienation and rejection of a parent?</u>

Given that we are not therapists but rather legal advocates, what can we do to help rebuild the parent-child relationship if it appears alienation may be occurring? First, we must understand what the term "reunification" means. Dr. Missar defines reunification as the therapeutic process by which the rejected parent and child address and then work through those factors that have led to the animosity and rejection (i.e., alienation) toward the goal of re-establishing their relationship.

My first recommendation would be to see if all parties can agree to address the rejection, even if both parents do not agree that alienation is occurring. Usually both parents will, at a minimum, agree that a child is rejecting or starting to reject a parent, even if they disagree as to the reason for the rejection. Identifying and hiring a therapist who understands alienation and who can immediately work with the family is paramount.

When the favored parent refuses to address the rejection, the attorney for the rejected parent might consider the following options:

- Filing a motion for reunification therapy;
- Filing a motion for a custody evaluation if the court has authority to order such evaluation;

- Filing a motion for a psychological evaluation of the favored parent (if the case-specific facts support such an evaluation); and
- Asking the court to increase the rejected parent's time with the child and/or for a complete transfer of custody.

From a therapeutic standpoint, Dr. Farber recommends the following four steps:

- Identify the source of the anxiety;
- Develop a step-by-step fear hierarchy;
- Teach relaxation skills, use rewards, moderate negative consequences; and
- Implement gradual reintroduction of the feared object (rejected parent).

Dr. Farber also cites three types of clinical and legal interventions:

- Gradual exposure of the child to the rejected parent- systematic desensitization;
- More intensive educational programs; and
- Reversal of custody, whether temporary or permanent.

Both experts agree that a reunification therapist should work with all three parties - the child, the rejected parent, and the favored parent - to address the issues which may have contributed to past or ongoing alienation. This is critical for successful reunification therapy. They also emphasize that the sooner the process is commenced, the better the chance for success because the less entrenched the alienation is to begin with, the better the chance of successful reunification.

Dr. Missar points out that when the favored parent does not fully participate in reunification nor encourage reunification, this can be another indication that alienation has occurred or is occurring. in this situation, as attorneys, we can ask the court to enter an order specifically setting forth the actions the favored parent is to take. For example, we can ask the court to enter an order:

- Appointing a reunification therapist;
- Requiring the favored parent to timely transport the children to therapy appointments;
- Requiring the favored parent to timely transport the children to all scheduled visitations with the rejected parent;
- Prohibiting the favored parent from infringing on the other parent's scheduled time and activities;
- Requiring all parties to participate in reunification therapy as recommended by the reunification therapist; and
- Requiring both parents to sign consent forms permitting the reunification therapist to speak with the children's past and present treating professionals (if any).

Depending on the level of animosity in the case and the number of professionals involved,[3] it may be appropriate to request the court to enter an order appointing a therapeutic coordinator to

---

[3] Which may include a reunification therapist, individual therapists for the child and/or parents, a parent coordinator, etc.

manage the reunification process. This person would facilitate communication and coordination with all parties and would convey pertinent information to the relevant therapists as appropriate. This therapeutic coordinator could also report to the court about the progress of reunification and make recommendations as to how to proceed with reunification. Obviously, the court is free to give as much weight to the coordinator's recommendations as it deems appropriate.

Dr. Farber outlines eight specific roles that the court can play in alienation cases:

1. Early involvement;
2. Judicial imprint on case;
3. Strong order of reunification;
4. Orders for treatment;
5. Education-impact on child and parent of avoidance;
6. Periodic reviews to help keep family on track (regularly scheduled reviews; yearly reviews are not effective because if a parent is not cooperating, the passage of a year will likely be too long to undo the damage);
7. Orders for more intensive treatment programs; and
8. Use of contempt orders, temporary suspensions of contact, and reversals of custody as a last resort.

Dr. Farber points out that while courts cannot order insight into the role the alienating parent plays, the court can order behavior change and provide judicial review to ensure compliance. He notes that the message must be sent to the child that there is absolute authority that reunification will happen, and the parents and child should be provided with an outline of the steps necessary to make reunification happen.

He further recommends that the child must be given permission by the favored parent to have a relationship with the rejected parent, even if reluctantly given/conveyed. During reunification sessions, Dr. Farber ensures that the favored parent voices authority to the child to have a relationship with the rejected parent. Thereafter, even if the favored parent tells the child something different outside of the therapeutic session, Dr. Farber will repeatedly remind the child that permission for a relationship was provided at one point, which can be very helpful to the reunification process.

As a practical matter, it can be incredibly difficult if not impossible to "prove" alienation is occurring. There are many ways in which alienation can be addressed, and in each instance, the attorney should focus on the unique facts of his/her case.

I have personally addressed the issue in two very different ways, with very different outcomes (though every case is case- and judge-specific, and what works in one case may not work in another). In one instance, we relied primarily on experts while in the other we provided recorded evidence demonstrating the parent's attempts at alienation.

If there is already a therapist involved who has recognized the rejection and alienation, it may make the most sense to have that therapist testify in court as to his/her observations and findings. If there are no therapists involved in the case who can testify that alienation may be

occurring, then it may make sense to hire an expert in clinical psychology who has significant experience with alienation cases. In such instances, having the expert define what constitutes alienation may be effective once coupled with evidence of the child and favored parent's respective behaviors. If the expert has not met any of the parties, the expert can opine on various hypotheticals which relate to the specific case facts (i.e., opining whether various hypotheticals are emblematic of alienation). Depending on the facts of the case, examples of such hypotheticals might include:

- What, if any, significance is there when a favored parent attends the child's activities during the rejected parent's scheduled time?
- What, if any, message would it send to the child if the favored parent took the child out for fun activities when the child refused contact with the rejected parent?
- What, if any, significance is there when a child refers to the rejected parent by his first name?
- What, if any, significance is there if the favored parent excludes the rejected parent from the child's developmental milestones?
- What, if any, significance is there if the favored parent refused to permit the rejected parent to transport the child to activities or doctor appointments, even when such activities and appointments occurred during the rejected parent's scheduled time?
- What, if any, significance is there if the favored parent calls the child every morning the child is in the rejected parent's care to ask the child if he/she is okay?
- What, if any, significance is there if the favored parent refers to the rejected parent in the third person when speaking with the child?
- What, if any, significance is there if the favored parent regularly picks up the child from the rejected parent's home prior to the end of scheduled visitation at the child's request?
- What, if any, significance is there if the child refers to the current spouse of the favored parent (i.e., the step-parent) as "Mom" or "Dad"?
- What, if any, significance is there if the favored parent keeps the child home from school to avoid the child going with the rejected parent for visitation which commences immediately following school dismissal?
- What, if any, message do you believe is conveyed to a child by the favored parent's acceptance of the child's decision as to when the child will, and will not, spend time with the rejected parent (regardless of the terms of a custody and visitation order)?
- What, if any, significance is there when the favored parent fails to institute any repercussions when the child refuses contact with the rejected parent?
- What if any, impact would there be on the child if the favored parent has the child come to court to testify against the rejected parent (outside of abuse and neglect situations)?

Outside of therapeutic and/or expert testimony, documenting the attempts at alienation can have a significant impact on the outcome of your case. In one of my alienation cases, my client told me early on that the other parent was trying to alienate the children from my client. I was involved early enough that the parties had not yet separated thus providing an opportunity to obtain evidence of the parent's attempts at alienation. The allegedly alienating parent appeared very credible and sympathetic and, for various reasons, I had concerns that my client might not come

off as credible. Accordingly, I advised my client to record what the other parent was saying.[4] The evidence my client brought back to me was profound.

In addition to my client's own verbal testimony as to the ways the other parent disparaged my client to the children, we also had recordings demonstrating the attempts at alienation which we played for the court. One recording was of an accidental voicemail that the other party left on my client's cell phone. In this voicemail, the parent could be heard saying to the children "you guys [will] have to make a decision where you want to stay, it's going to be full on war…keep telling everybody you want to stay with [me]." Other recordings provided evidence that the other parent told the children[5] that my client "was a liar" who did not "stand by [his/her] words" and that the children would know "one day, what [my client] did … and you will hate [my client] and [my client's f'ing] mother for it."[6]

I do not usually recommend to my clients that they record the other parent even if legal (and I generally strongly advise against it) because it does not foster co-parenting and often tears down trust. However, where there is significant and rational reason to believe that alienation has occurred or may be occurring, this can serve as powerful evidence in a he-said/she-said situation.

## VI. Conclusion

When we represent a rejected parent and we suspect alienation may be occurring, we need to act fast. The longer we wait to act, the more entrenched the alienation will become, and the less chance that successful reunification may occur. To the extent possible, we need to provide motivation for the favored parent, the rejected parent and the alienated child to participate in reunification efforts. Judges and attorneys must be unified in the message that, absent an extreme situation such as child abuse or an unfit parent, children deserve and need two parents in their lives.

It is important to ensure the education of attorneys, judges and the relevant players. The experts I interviewed agree that when a child loses his/her relationship with one parent, the child will suffer in the short and long term. As advocates, we can point our clients to relevant literature, we can educate judges through the use of expert testimony, and we can assist in crafting strong orders with appropriate review. If we are unable to obtain a custody trial in the short term, we should try to obtain an interim order for reunification therapy so that, at a minimum, contact is maintained before the child becomes irreparably entrenched in his/her position. While this may be a tall order, perhaps we can also try to have a greater appreciation for each party's views as we work towards providing children the best upbringing possible.

---

[4] The circumstances under which my client's recordings were made were legal in my jurisdiction. Jurisdictions vary with respect to when recording a party is or is not legal.
[5] The children could be heard in the background of this recording, so there was little question as to whether the children heard the parent say these things.
[6] The way in which the allegedly alienating parent attempted to turn the children against my client's mother is in line with the "spread" referenced by Dr. Farber early in this article.

## VII. **Information on clinical psychologists interviewed for this article**

Dr. Farber's contact information is as follows:

> Edward D. Farber, Ph.D.
> Reston Psychological Center, P.C.
> 1800 Town Center Drive, Suite 411
> Reston, Virginia 20190
> (703) 437-3236

Dr. Edward Farber provides diagnostic and therapeutic psychological services to children, adolescents and adults from primarily a cognitive behavioral perspective. A licensed clinical psychologist in Virginia and Maryland, Dr. Farber is involved in clinical practice, teaching and research. Dr. Farber's practice has included forensic evaluations to include parent/child attachment and bonding and custody evaluations involving children, adolescents and adults.

Dr. Farber is on faculty at the George Washington University School of Medicine. Formerly the Chair of Psychology at the Ohio State University Pediatrics Department and Columbus Children's Hospital, Dr. Farber draws upon academic expertise in his clinical practice to provide a broad range of clinical services. His doctorate is from Ohio State with further training at New York University Medical Center, Bellevue Hospital and Children's Hospital.

Dr. Farber is the author of the co-parenting guide "Raising the Kid you Love with the ex You Hate." He also wrote an article on alienation for the Virginia Family Law Quarterly Newsletter (Spring 2016 edition) titled: "Putting it Together: Reunification Therapy Bit by Bit." Dr. Farber has also lectured throughout Virginia on the topic of alienation and reunification and he frequently testifies in Virginia courts as an expert on custody matters including alienation and reunification.

Dr. Missar's information is as follows:

> Charles David Missar, Ph.D.
> 3300 M Street, N.W., Suite 201
> Washington, DC 20007
> Telephone: 202-965-4330

Dr. Missar has extensive experience in the area of high conflict custody matters, including without limitation substantial background and expertise in the areas of parent alienation and reunification.

Dr. Missar has a Ph.D. In clinical psychology and has been licensed since 1990. He has provided individual, couples, group and family therapy in a private practice setting since 1993. The majority of Dr. Missar's psychotherapy has been with adults and

9

adolescents but he has also worked with many children. Dr. Missar's practice has included forensic evaluations to include parent/child attachment and bonding and custody evaluations involving children, adolescents and adults. With regard to the latter, Dr. Missar has conducted over 1,000 evaluations where parental alienation was a specific issue. In addition, he has provided reunification therapy over 100 times and has also written and/or testified about the benefits of reunification therapy in parental alienation cases hundreds of times. Dr. Missar has served as both an invited presenter as well as invited faculty many times with respect to assessment of custody and parent/child relationships and attachment.

Dr. Missar has provided expert testimony in courts throughout the District of Columbia, Maryland and Virginia as well as in the U.S. District Court.